[Cite as *State v. Lawrence*, 2014-Ohio-417.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

STATE OF OHIO

      Plaintiff-Appellee

v.

PHILLIP H. LAWRENCE

      Defendant-Appellant


Appellate Case No.    25623

Trial Court Case No.   2001-CR-459


(Criminal Appeal from
 Common Pleas Court)

. . . . . . . . . . .

# O P I N I O N

Rendered on the 7th day of February, 2014.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by ANDREW T. FRENCH, Atty. Reg. No. 0069384, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, P.O. Box 972, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Plaintiff-Appellee

LUCAS W. WILDER, Atty. Reg. No. 0074057, 120 West Second Street, 400 Liberty Tower, Dayton, Ohio 45402
      Attorney for Defendant-Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Defendant-Appellant, Phillip Lawrence, appeals from a judgment overruling Lawrence's motion for a new trial based on newly discovered evidence. Lawrence contends that the trial court abused its discretion in denying the motion.

{¶ 2} We conclude that the trial court did not abuse its discretion in denying Lawrence's motion for a new trial. In considering the motion, the trial court did not err in considering the credibility of the newly discovered witness. There is not a strong probability that a jury could have found reasonable doubt that Lawrence was the perpetrator of the crime, if the jury considered the newly discovered witness's testimony, along with the testimony of the other witnesses. Accordingly, the judgment of the trial court will be affirmed.

I. Facts and Course of Proceedings

{¶ 3} In August 2001, Phillip Lawrence was convicted of having murdered Antonne Pollard on October 24, 2000, at Parkside Homes, in Dayton, Ohio. We affirmed Lawrence's conviction and sentence in October 2002. *See State v. Lawrence*, 2d Dist. Montgomery No. 19059, 2002-Ohio-5533. In *Lawrence*, we recounted the following factual background of the crime:

> On the morning of October 24, 2000, some time before 8:00 a.m., Taquita Young opened the back door of her house, heard gunshots, and saw a man running around the corner of her house, with his right arm extended. Young did not see the man's face, but nevertheless recognized him as Lawrence, known to her as "P.J.," who lived directly across from her in the next house. In addition to recognizing

Lawrence's physical characteristics, Young noted that he was wearing a black jogging suit that she often saw Lawrence wearing.

Almost simultaneously, Young heard a knocking at her front door, cries for help, and more gunshots. Young went to her front window, and looked through the blinds. She saw Antonne Pollard, known to her as "Tonne," in the grassy area between her building and the next building. Tonne quickly disappeared from her view.

Meanwhile, Christopher Lacy was asleep in his bedroom when he also heard gunshots. He then heard a male voice screaming, "help, help, help," at his back door. As Lacy approached the back door, it flew open, and Pollard, whom Lacy had never seen before, was standing outside. Lacy saw that Pollard had been shot in the chest, and directed him to the living room couch.

Lacy left Pollard in the house, and went two doors down to his aunt, Milan Jackson. Jackson had already called 9-1-1, because she, also, had heard gunshots and cries for help. Jackson went with Lacy back to Lacy's house, to check on Pollard. Young also arrived at the house, upon learning that Pollard had been shot. Lacy asked Pollard, "who shot you?" Pollard replied, "P.J."

Young returned to her house. As she did so, she saw Lawrence, walking in her direction, and made eye contact. Lawrence had a gun in his hand. Lawrence was "just lookin' at me with the looks to kill as if - if I say somethin' I'll be next." Young recognized Lawrence, and confirmed her recognition of Lawrence as having been the person she saw earlier, running around the corner of

her house.

Meanwhile, Pollard told a responding police officer that he had been shot. In response to the officer's question, Pollard identified the person who shot him as "P.J." When the officer asked Pollard, "do you know his real name besides P.J.?" Antonne shook his head "no."

Pollard died a little less than an hour later, at the hospital where he had been taken, as the result of the gunshot wound to his chest.

Lawrence was indicted for the purposeful Murder of Pollard, with a firearm specification, and also for Murder as a proximate result of his committing or attempting to commit Felonious Assault, also with a firearm specification. Following a jury trial, Lawrence was found guilty of both charges, and both firearm specifications. The trial court merged the Murder convictions into one, [and] merged the firearm specification into one firearm specification * * *. *Lawrence* at ¶ 3-10.

{¶ 4} As a result of the conviction, Lawrence was sentenced to 18 years to life in prison. At trial, Lawrence presented an alibi defense, based on the statements of his girlfriend, LaTasha Wade, who testified that Lawrence was at home at the time of the shooting. Lawrence also presented evidence that he had clocked in at his place of employment at 8:15 a.m. on the day of the shooting, or within 45 minutes after the shooting occurred.

{¶ 5} In February 2011, Lawrence was brought before the trial court for re-sentencing, for purposes of indicating that Lawrence would be on parole, not post-release control, on his release from prison. Lawrence appealed again, and we affirmed the judgment of the trial court

in November 2011.   *See State v. Lawrence*, 2d Dist. Montgomery No. 24513, 2011-Ohio-5813.

**{¶ 6}**     While the second appeal was pending, Lawrence filed a motion for leave to file a delayed motion for new trial, based on newly discovered evidence.   The trial court denied the motion without holding a hearing, and without explaining its reasoning.   After Lawrence appealed, we reversed the judgment of the trial court.   We concluded that even though an appeal was pending when Lawrence filed his motion, trial courts retain jurisdiction to consider the preliminary step of whether a defendant may file a motion for leave to file a delayed motion for new trial.   See *State v. Lawrence*, 2d Dist. Montgomery No. 24725, 2012-Ohio-837, ¶ 20.   We, therefore, remanded the case on March 20, 2012, to let the trial court consider the merits of the motion for leave to file a delayed motion for new trial.   *Id.* at ¶ 22.   By that time, the prior appeal had been decided.

**{¶ 7}**     In June 2012, the trial court held a hearing on the motion for leave to file a delayed motion for new trial.   At the hearing, Lawrence presented testimony from Bobby Groce, Jr., who was a fellow inmate at the Warren Correctional Institution (WCI).   Groce had been in prison since 2003, following his conviction on three counts of aggravated robbery.   Groce and Lawrence were housed in different units, and Groce first met Lawrence in January 2011, when Groce was refereeing a basketball game.

**{¶ 8}**     About a month before the basketball game, Groce overheard two other inmates talking about the Pollard murder.   The facts they discussed were not correct, based on Groce's knowledge of the murder.   From their discussion, Groce also became aware that another inmate, Phillip Lawrence, had been tried and convicted of the murder, and was located at WCI.   When Groce saw Lawrence's name on the basketball roster, he decided to tell Lawrence what he knew.

Lawrence then asked him to sign an affidavit.

{¶ 9}  At the hearing, Groce testified that on October 24, 2000, he was at Parkside Homes between 5:00 a.m. and 8:00 a.m., selling drugs.  At approximately 7:00 a.m., gunshots erupted in Groce's direction.  Groce ducked down behind cars that were parked on the alley street.  Once he was secure, he looked in the direction where the shots were coming from, because he thought someone might be shooting at him.  Groce saw a man (Pollard) running toward him, screaming for help as he was being chased by another man, who was shooting at him.  There were no other people in the area other than the two men who were running.

{¶ 10}  Groce saw Pollard for a second, but kept his eye on the shooter, because the shooter was the main threat.  Groce described the shooter as being tall, of stocky build, with brown skin, and short hair.  He recognized the shooter as a person with a street name of "Cheese," whom he had known for about a month and a half.  Groce did not know Cheese's real name, but had bought drugs from Cheese a few times, when his regular source at Parkside was not around.

{¶ 11}  Once it was safe for him to leave, Groce ran around to the front of the building, got in his car, and left.  Later that day, he found out on the news that a man named Tone Pollard had been gunned down.  Groce testified that he knew Pollard.  Pollard was a drug addict, and Groce had seen Pollard once on the day he was shot.  He described Pollard as being of average build, tall, with short hair, and black.

{¶ 12}  Groce did not contact the police at the time, because he had his own troubles with the law.  He was a gang member and was selling drugs.  He also had active warrants pending.  However, Groce decided to come forward after learning that Lawrence had been

convicted, because he (Groce) considered himself a changed person who was productive to society, or at least was becoming productive. Groce stated that he became a changed person in 2008, after being baptized. Subsequently, however, he was involved in a gang riot at London Correctional Institution in 2009, which resulted in his confinement in disciplinary segregation for almost six months.

{¶ 13} After being transferred back to WCI in April 2010, Groce heard about the murder in December 2010, and then met Lawrence in January 2011. Groce indicated that he was still involved in gang activity, as part of the "74GD" gang. At the time of the hearing in June 2012, Groce had been "in the hole" for nine months, due to having established an unauthorized relationship with a correctional officer. The allegations in this regard were that Groce had taken control of the account office by corrupting a captain, and was making cell moves for inmates within the facility, for money. The captain was fired, and Groce was placed in solitary confinement, pending transfer to a more secure facility.

{¶ 14} After hearing the evidence, the trial court concluded that Lawrence had established that he had been unavoidably prevented from filing a motion for new trial within 120 days, and could not, with reasonable diligence, have discovered and presented Groce's information at trial. Lawrence then filed his motion for new trial in August 2012, and the State filed a memorandum opposing the motion. Without conducting a further hearing, the trial court overruled the motion for new trial in January 2013.

{¶ 15} The trial court concluded that Lawrence had failed to establish a strong probability of a different result if Groce's testimony were presented at a new trial. In addition, the court held that Groce's testimony and affidavit did no more than impeach or contradict

former evidence.

{¶ 16}    Lawrence appeals from the order overruling his motion for new trial.

## II.   Did the Trial Court Err in Overruling

## the Motion for New Trial?

{¶ 17}    Lawrence's sole assignment of error states that:

Whether the Trial Court Abused Its Discretion in Denying Mr. Lawrence a

New Trial Based upon Newly Discovered Evidence.

{¶ 18}    Under this assignment of error, Lawrence contends that the trial court abused its

discretion in denying the motion for new trial, because the testimony of Bobby Groce tends to

create reasonable doubt about who shot Pollard.   The State disagrees, arguing that Groce was not

credible, and that his testimony is questionable.

{¶ 19}    In *State v. Petro*, 148 Ohio St. 505, 76 N.E.2d 370 (1947), the Supreme Court of

Ohio held that:

To warrant the granting of a motion for a new trial in a criminal case,

based on the ground of newly discovered evidence, it must be shown that the new

evidence (1) discloses a strong probability that it will change the result if a new

trial is granted, (2) has been discovered since the trial, (3) is such as could not in

the exercise of due diligence have been discovered before the trial, (4) is material

to the issues, (5) is not merely cumulative to former evidence, and (6) does not

merely impeach or contradict the former evidence.   *Id.* at 505-506, syllabus.

{¶ 20}    In the case before us, the trial court held a hearing in connection with the motion

for leave to file a delayed motion for new trial. The only witness at that hearing was Bobby Groce. After granting the motion, the trial court did not conduct any further hearings, but concluded that Lawrence had failed to establish a strong probability of a different result if Groce's testimony were presented at a new trial. In addition, the court held that Groce's testimony and affidavit did no more than impeach or contradict former evidence. The court, therefore, concluded that Lawrence failed to meet the first and sixth prongs of the test outlined in *Petro*.

{¶ 21} As a preliminary point, we note our prior decision in *City of Dayton v. Martin,* 43 Ohio App.3d 87, 539 N.E.2d 646 (2d Dist.1987), which states that:

> While *Petro* stands for the proposition that newly discovered evidence that merely impeaches or contradicts other evidence is not enough for a new trial, we do not read *Petro* as establishing a per se rule excluding newly discovered evidence as a basis for a new trial simply because that evidence is in the nature of impeaching or contradicting evidence. The test is whether the newly discovered evidence would create a strong probability of a different result at trial, or whether it is merely impeaching or contradicting evidence that is insufficient to create a strong probability of a different result.
>
> In singling out impeaching or contradicting evidence, *Petro* recognized that the nature of such evidence requires that a trial court exercise circumspection in determining whether newly discovered evidence of that character would create a strong probability of a different result, because such evidence quite often will not be likely to change the outcome. In a case where the newly discovered

evidence, though it is impeaching or contradicting in character, would be likely to change the outcome of the trial, we see no good reason not to grant a new trial. (Citations omitted.)   *Id.* at 90.

**{¶ 22}**   We have continued to adhere to this view.   *See, e.g.*, *State v. Beavers*, 2d Dist. Montgomery No. 22588, 2009-Ohio-5604, ¶ 19-21.   Accordingly, in rejecting the sixth factor, the trial court should not have focused solely on the fact that "Groce's testimony and affidavit does nothing more than create a contradiction."   Decision Order and Entry Overruling Defendant's Motion for New Trial, Doc. #26, p. 3.   Instead, the court should have considered whether the "newly discovered evidence though it is impeaching or contradicting in character, would be likely to change the outcome of the trial."   *Martin* at 90.

**{¶ 23}**   With respect to the issue of whether Groce's testimony would be likely to change the outcome of the trial, the trial court stated that:

The first element requires the Defendant to show that there is a strong probability, not simply a possibility, that the result will change if a new trial is granted, and he cannot do that.   Defendant has presented the affidavit and testimony of Bobby Groce, a fellow inmate, who has a long history of meandering around the law and who also conveniently was on the scene at the time of the shooting.   According to Defendant, Groce's testimony carries such credibility that it would have swayed the jury such that their verdict would have come back not guilty.   However, the Court is not convinced that the jury would have been so swift to believe a drug dealer over local resident and mother, Taquita Young.   Moreover, Groce's testimony relates only to the identity of the shooter.   If a jury believed that Ms.

Young "implanted" P.J.'s identity in Tonne's mind or that his mind and dying declarations were not credible due to Tonne's intoxication, it would have drawn those conclusions at the time of trial, without Groce's testimony. Therefore, the Court finds that the probability that Bobby Groce's testimony would change the result at trial is slim, and not sufficient for the Court to warrant a new trial. *Id*. at p. 4.

**{¶ 24}** A trial court's decision on a Crim.R. 33 motion for a new trial will not be reversed unless the court abused its discretion. *State v. Schiebel*, 55 Ohio St.3d 71, 564 N.E.2d 54 (1990), paragraph one of the syllabus; *State v. Matthews*, 81 Ohio St.3d 375, 378, 691 N.E.2d 1041 (1998). In *Beavers*, 2d Dist. Montgomery No. 22588, 2009-Ohio-5604, we noted that:

> The term "abuse of discretion" "implies that the court's attitude is unreasonable, arbitrary or unconscionable." *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144. Understandably, most instances in which abuses of discretion have been found have involved a determination that the trial court's decision is unreasonable, not that it is arbitrary or unconscionable. *AAAA Enterprises, Inc. v. Riverplace Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597. *Beavers* at ¶ 23.

**{¶ 25}** We also stressed in *Beavers* that:

> Another way of considering judicial discretion is that when a determination has been confided to the discretion of a trial court, a reviewing court must give some deference to the trial court's determination. The extent of that deference is situationally dependent. A trial court's determination of how

much of the jury voir dire will be conducted by the trial judge before turning the voir dire over to the attorneys, for example, is entitled to great deference. Other determinations - the determination whether a criminal defendant understands the rights he is waiving by pleading guilty, for example - are entitled to less deference. The extent of the deference to be accorded to a determination to be made by a trial court is also dependent upon the extent of guidance informing that determination imposed by higher authority, in the form of case law or statutory law. Where the external guidance informing a decision confided to the discretion of a trial court is extensive, the deference accorded to that decision will naturally be somewhat less. *Id.* at ¶ 24.

**{¶ 26}** In this regard, we stressed that because *Petro* and the cases following *Petro* informed the trial court's decision, that decision was "not being made in a jurisprudential vacuum." *Id.* at ¶ 26. Thus, "[w]here a case has been tried to a jury, a motion for new trial requires the court to determine whether it is likely that the jury would have reached a different verdict had it considered the newly discovered evidence[,]" and the reviewing court's task is to decide if the trial court "abused its discretion in making that determination." (Citation omitted.) *Id.* at ¶ 27.

**{¶ 27}** In *Beavers*, the trial court's rejection of the motion was based on inconsistencies between the testimony of the newly discovered witness and other witnesses who testified at trial. *Beavers*, 2d Dist. Montgomery No. 22588, 2009-Ohio-5604, at ¶ 28-31. The trial court also relied on the fact that the newly discovered witness's "prior convictions, 'several of which [were] for crimes involving dishonesty,' would serve to undermine his credibility as a witness at trial."

*Id.* at ¶ 32. In reviewing the matter, we stressed that "[q]uestions of credibility are, of course, primarily for a jury to determine." *Id.*, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967).

**{¶ 28}** We concluded that the crux of the case was whether the testimony of the new witness was merely cumulative of a defense witness who had already testified at trial that the shooter was not the defendant. *Id.* at ¶ 34. We held that the new witness was in a better position to observe the perpetrator, and provided "a much stronger foundation for his conclusion that Beavers was not the shooter." *Id.* at ¶ 35. We further noted that this evidence was "different, in kind and character," from the evidence represented by the prior defense witness. *Id.* We then reversed the trial court's denial of the motion for new trial, stating that:

> This was not an overwhelming evidence case. Both sides presented eyewitness testimony, and the eyewitness testimony presented by each side contained some inconsistencies. The State did present testimony from Agnes Maston, who testified that a person claiming to be "Warren Beavers," and later "Juan Beavers," but believed by her to have been Reuben Beavers, talked to her on the phone on three occasions and acknowledged having shot into the "boot joint." Beavers presented alibi testimony.
>
> As in every criminal case, a jury would not have to find that Beavers was not the shooter; it would merely have to find the existence of reasonable doubt that Beavers was the shooter. We conclude that Mease's testimony is not merely cumulative, and that if a jury were to hear Mease's testimony - subject, to be sure, to vigorous cross-examination - along with all the other evidence from both

parties, there is a strong probability that the jury would have reasonable doubt, and acquit. *Id.* at ¶ 36-37.

{¶ 29} We, therefore, reversed the case and remanded it to the trial court. On remand, the trial court elected to hold another evidentiary hearing, at which the court took evidence from the defendant and the newly discovered witness, and from a state's investigator, whose affidavit the State had previously submitted. *State v. Beavers*, 2d Dist. Montgomery No. 24671, 2012-Ohio-3711 ¶ 16. The evidence from the investigator included conversations he had with the defendant's cell-mate, who told him that the defendant had admitted to the crime on various occasions. The defendant also told his cell-mate that he had paid money to the new witness's family for his testimony. *Id.* at ¶ 18. In addition, the investigator had talked to the owner of the "boot joint" where the shooting occurred, and to the victim. Both individuals said that the defendant was not at the boot joint that night. *Id.* The investigator had also interviewed the wife of the owner of the boot joint, who said that the defendant called her the day after the shooting to apologize. *Id.* at ¶ 19-20.

{¶ 30} After hearing the evidence, the trial court again overruled the motion for a new trial, concluding that " 'no reasonable jury would find Mease [the newly discovered witness] to be a credible witness at trial.' " *Id.* at ¶ 22. We rejected the trial court's credibility determination, for the following reasons:

It is well settled (and has been previously noted in this case) that "[q]uestions of credibility are, of course, primarily for the jury to determine." *Beavers VI* at ¶ 32, citing *DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). Although we acknowledge that the State would have several bases upon which to

challenge Mease's credibility if a new trial were granted, the same is true with respect to most of the witnesses in this case. Some witnesses on both sides of the case were criminals, convicted or not, and had questionable or self-serving reasons for testifying as they did. In our view, the trial court erred in attempting [to] resolve how a jury would weigh the credibility of these witnesses. This is not the trial court's role in a case involving a jury trial and, as we have previously held in this case, considering the colorful array of past and potential witnesses in this case, it is not apparent that Mease's testimony would be "intrinsically much less worthy of belief than that of the other eyewitnesses." *Id*. at ¶ 33. *Beavers*, 2d Dist. Montgomery No. 24671, 2012-Ohio-3711, at ¶ 27.

**{¶ 31}** Having reviewed *Beavers* in detail, we acknowledge that in jury trials, credibility questions are primarily for the jury to determine. However, in order to evaluate whether newly discovered evidence creates a strong probability that it will change the result, the trial court necessarily must also evaluate the credibility of the presented testimony, albeit with some circumspection.

**{¶ 32}** Furthermore, our comment in *Beavers* about the trial court's credibility determination must be read in the context of the facts in the opinion. In *Beavers*, the claimed newly discovered evidence was a jailhouse witness by the name of Mease who submitted an affidavit, and later testified at a hearing, that Beavers was not the shooter in the felonious assault and two counts of shooting into a habitation for which he had been convicted. *Beavers*, 2d Dist. Montgomery No. 24671, 2012-Ohio-3711, at ¶ 3-4. The trial court's revisited denial of a new trial was based on the conclusion that "no reasonable jury would find Mease to be a credible

witness at trial." *Id.* at ¶ 22. However, we had previously reversed the trial court, at least twice, with respect to the new trial issue. We had also previously expressed the view that Mease's testimony created "a strong probaility that the jury would have reasonable doubt, and acquit." *Beavers*, 2d Dist. Montgomery No. 22588, 2009-Ohio-5604, at ¶ 37.

{¶ 33} After the 2009 *Beavers* decision, the trial court took additional evidence that undermined Mease's credibility. We noted in our 2012 opinion that this evidence, which included statements obtained by Gary Ware, an investigator for the prosecutor, would not have been admissible to undermine Mease's credibility at a new trial. *Beavers*, 2d Dist. Montgomery No. 24671, 2012-Ohio-3711, at ¶ 28. Therefore, we found that "the trial court incorrectly concluded that the evidence offered by Ware in the form of hearsay statements would undercut Mease's testimony before a jury, and it incorrectly relied on such statements itself." *Id.*

{¶ 34} Accordingly, we concluded that the trial court was incorrect in its credibility evaluation. However, the reasons for the trial court's error were: 1) we had already determined that Mease's testimony was sufficient to require a new trial; and 2) in its credibility evaluation, the trial court relied, in part, on evidence that a jury would never hear.

{¶ 35} Credibility evaluation is an important function of triers of fact. In the context of motions for new trial, a trial court is the trier of fact who must decide if there is a strong probability of a different result. As one example, the need for trial court evaluation of credibility of new evidence is particularly apparent in situations of witness recantation. *State v. Velez*, 9th Dist Lorain No. 09CA009564, 2010-Ohio-312, ¶13 and ¶ 21-22.

{¶ 36} The standard in this regard is that "[a] trial court may grant a motion for new trial on the grounds that a witness has recanted her testimony when the trial court determines that

the statements of the recanting witness are credible and true." (Citations omitted.) *State v. Covender*, 9th Dist. Lorain No. 07CA009228, 2008-Ohio-1453, ¶ 11. However, "[n]ewly discovered evidence that recants testimony given at trial is 'looked upon with the utmost suspicion.' " *Id.*, quoting *State v. Elkins*, 9th Dist. Summit No. 21380, 2003-Ohio-4522, ¶ 15. (Other citations omitted.) *Accord State v. Rossi*, 2d Dist. Montgomery No. 24740, 2012-Ohio-2545, ¶ 17.

{¶ 37} Courts have also noted that " '[r]ecantation by a significant witness does not, as a matter of law, entitle the defendant to a new trial.' " *Covender* at ¶ 12, quoting *State v. Walker*, 101 Ohio App.3d 433, 435, 655 N.E.2d 823 (8th Dist.1995). Implicit in these standards is the fact that trial courts must evaluate credibility in deciding the motion. If trial courts could not evaluate the credibility of recanted testimony, every recantation after trial would result in a new trial.

{¶ 38} The same observations may be made about the need to evaluate incredulous evidence that has been presented by affidavit or in person, when a court is deciding if a new trial is warranted on other grounds. If credibility decisions were not allowed, every motion for new trial would have to be granted, assuming the other prerequisites were met.

{¶ 39} We also previously held in *State v. Martin*, 2d Dist. Montgomery No. 20383, 2005-Ohio-209, that a trial court did not abuse its discretion when it found that testimony of an alleged eyewitness that the defendant was not the shooter lacked credibility, and that the defendant, as a result, was not entitled to new trial on that basis. *Id.* at ¶ 4 and 15-17. In a related context, the Ohio Supreme Court has held that a trial court may, in the exercise of its discretion, weigh the credibility of affidavits presented in support of a petition for

post-conviction relief. *See Satte v. Calhoun*, 86 Ohio St 3d 279, 714 N.E.2d 905 (1999). In this regard, the court stressed that:

> [A] trial court should give due deference to affidavits sworn to under oath and filed in support of the petition, but may, in the sound exercise of discretion, judge their credibility in determining whether to accept the affidavits as true statements of fact. To hold otherwise would require a hearing for every postconviction relief petition. Because the statute clearly calls for discretion in determining whether to grant a hearing, accepting all supporting affidavits as true is certainly not what the statute intended. *Id*. at 284.

{¶ 40} Notably, a paper affidavit affords a trial court with no ability to view demeanor – yet the Supreme Court of Ohio still concluded that trial courts could judge credibility in their discretion.

{¶ 41} Based on the preceding discussion, we believe the statement in *Beavers* that "the trial court erred in attempting to resolve how a jury would weigh the credibility of these witnesses" should be understood in the context of the unique facts and the law of that case. *See Beavers,* 2d Dist. Montgomery No. 24671, 2012-Ohio-3711, at ¶ 27. In considering whether there is a strong probability of a different result, a trial court may exercise its discretion to evaluate the credibility of the evidence that a jury is likely to hear.

{¶ 42} In the case before us, the trial court made a credibility determination when it concluded that the jury would not readily believe the testimony of a witness who had a long history of "meandering around the law" and who was a drug dealer, over that of a witness who was a local mother. We have indicated that the court was permitted to make this determination.

**{¶ 43}** Furthermore, this case differs factually from *Beavers*. In addition to having an eyewitness to the shooting, that witness (Taquita Young), as well as two other witnesses, heard the victim identify the shooter as P.J. – which was Lawrence's nickname. Although Young was a friend of the victim, the two other witnesses were a police officer who arrived at the crime scene, and a neighbor who did not know the victim. Both of these witnesses would have had no reason to lie. In contrast, the newly-discovered witness, Groce, indicated that the shooter's nickname was "Cheese" – which does nothing to discredit the victim's identification of "P.J." as the shooter.

**{¶ 44}** As an additional matter, the trial court did not base its decision on testimony that would have been inadmissible for purposes of impeaching Groce. Instead, the court relied on the testimony of Groce, who was the only witness at the hearing.

**{¶ 45}** We also note that we described *Beavers* as " 'not an overwhelming evidence case.' " *Beavers,* 2d Dist. Montgomery No. 24671, 2012-Ohio-3711, at ¶ 27, quoting *Beavers*, 2d Dist. Montgomery No. 22588, 2009–Ohio–5604, at ¶ 36. In contrast, we stated in Lawrence's direct appeal that the defense case was not "hopeless." *Lawrence*, 2d Dist. Montgomery No. 19059, 2002-Ohio-5533, at ¶ 135.

**{¶ 46}** Under the circumstances, we conclude that the trial court did not abuse its discretion by concluding that the newly discovered evidence would not create a strong probability of a different result at trial. *Martin,* 43 Ohio App.3d at 90, 539 N.E.2d 646.

**{¶ 47}** Accordingly, Lawrence's sole assignment of error is overruled.

III. Conclusion

**{¶ 48}** Lawrence's sole assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FAIN and HALL, JJ.,   concur.

Copies mailed to:

Mathias H. Heck
Andrew T. French
Lucas W. Wilder
Hon. Gregory F. Singer